CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
March 24, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| GARY HANCOCK, ) | |
|     Plaintiff, ) | Civil Action No. 7:22cv00192 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| UNITED STATES, ) | By:  Robert S. Ballou |
|     Defendant. ) | United States District Judge |

Gary Hancock, a federal inmate proceeding *pro se*, has filed suit against the United States under the Federal Tort Claims Act (FTCA), alleging medical malpractice by the medical personnel employed at USP Lee between April 2018 and August 2020.  The defendant has filed a Motion for Summary Judgment pursuant to FED. R. CIV. P. 56(a).  For the reasons stated below, I will grant the motion.

## I.  STANDARD OF REVIEW

A party is entitled to summary judgment if he can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden of establishing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  To meet this burden, the moving party must support his claim by citing to material portions of documents in the record and/or sworn affidavits of admissible evidence, signed by a person with personal knowledge of the facts recited in the affidavit.  FED. R. CIV. P. 56(c).

Once the moving party has met this burden, the non-moving party may not rely on allegations in his Complaint, nor may he rely on personal beliefs, conjecture, speculation, or conclusory statements.  *Richardson v. Clarke*, 52 F.4th 614, 620 (4th Cir. 2022).  Rather, the non-

moving party must present admissible evidence and affidavits that contradict the material, relevant evidence offered by the moving party. *Anderson*, 477 U.S. 257. The non-moving party can prevail only if reasonable minds could reach a verdict in favor of the non-moving party based on the responsive evidence offered. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). In deciding whether the non-moving party has met the burden of showing the existence of a material disputed fact, the court must consider the amount and nature of evidence necessary to sustain a verdict at trial. *Anderson*, 477 U.S. at 254.

## II. Discussion

Hancock alleges that the medical personnel at USP Lee were negligent in providing medical services in the following ways:

1. Failing to pursue alternative treatment of his chronic constipation and abdominal pain, when advised that the over-the-counter (OTC) medications were not working;
2. Failing to refer him to a gastro-intestinal specialist when they could not diagnose his condition;
3. Refusing to prescribe stronger pain medication;
4. Failing to notify him of his abnormal lab results and failing to pursue follow-up testing and/or treatment based on those results; and
5. Failing to timely provide seizure medication when notified that he was again having seizures.

To prove a medical malpractice claim in Virginia, a plaintiff must establish: (1) the standard of care applicable to medical practitioners such as those employed by the defendant; (2) a deviation from that standard; and (3) that such deprivation proximately caused the plaintiff's injuries or damages. *Byers v. City of Richmond*, 746 F. Supp. 3d 275, 334 (E.D. Va. 2024).

Usually, the plaintiff must present expert testimony to establish the standard of care, deviation from the standard, and causation of injuries. *Raines v. Lutz*, 341 S.E.2d 194, 197 (Va. 1986).

The only evidence meeting the required standard of admissible evidence has been offered by the defendant in the form of affidavits from Dr. Choi, a gastroenterologist (ECF No. 46-8), and Dr. Guha, a neurologist (ECF No. 46-7), supported by the medical records from the U.S. Bureau of Prisons (BOP) from 2018 through 2022 (ECF Nos. 46.2 to 46.6). The court notified Hancock by Notice dated August 20, 2024, that he needed to respond to the defendant's Motion for Summary Judgment within 21 days, by supplying counter-affidavits or other relevant evidence to contradict the facts alleged by the defendant. ECF No. 47. The Notice stated that if Hancock failed to respond, the court would assume "that Plaintiff agrees with what the Defendant states in their responsive pleadings." *Id.* Following the status conference with the court on September 16, 2024, the court granted Hancock additional time to respond until October 28, 2024. ECF No. 56. The order advised Hancock that "failure to respond to Defendant's Motion for Summary Judgment may result in dismissal of his claims. *Id.* At the end of October, Hancock requested another extension of time to respond to the Motion for Summary Judgment, which the court orally granted by Order entered November 4, giving Hancock until January 3, 2025, to respond. ECF No. 58. The order was mailed to Hancock on November 6, 2024. Two months have passed since the January 3 deadline, and Hancock has neither submitted a response nor contacted the court further. Nor has he identified any expert witness to support his claims.[1]

---

[1] The Court will consider the motion for summary judgment without a response from Hancock. He has received sufficient notice of the pending motion and the need to submit a response supported by affidavits or other evidence, but he has not done so. This case is distinguishable from *Farabee v. Gardella*, ___ F.4th ___, 2025 WL 759603 (March 11, 2025 4th Cir.) where the court reversed an award of summary judgment despite the plaintiff having mental health issues and requesting an opportunity for discovery.

### A. Failing to Pursue Alternative Treatment when OTC medications were "not working"

Dr. Choi, a gastroenterologist, addressed the first four claims alleged in Hancock's Complaint. He stated that the standard of care required a course of OTC medicine to assist with chronic constipation, which the medical staff at Lee first prescribed in April and May 2018. When Hancock continued to complain of pain, the medical staff ordered further testing to make sure that a more serious condition was not being overlooked. August 2018 abdominal x-rays revealed stool and air in his colon, which were not pathological findings. The medical staff appropriately ordered continued OTC medication, plus increasing his water consumption and exercise. On February 28, 2019, a repeat abdominal x-ray again revealed stool in the colon and no obstruction. The medical staff ordered stool testing for occult blood to screen for cancer. The test was negative, and the recommendation for OTC meds, more water, and exercise was appropriately continued. On September 30, 2019, several stool cultures were ordered, but all came back negative, making the proper treatment to continue with OTC medications for constipation. Choi Aff't at 2–3, ECF No. 46-8.

On January 14, 2020, Hancock was seen by a telehealth doctor at the prison, who recommended an abdominal ultrasound. The BOP utilization review committee denied the ultrasound. Dr. Choi stated in his affidavit that an abdominal ultrasound was not indicated, and therefore not required under the applicable standard of care, because the primary purpose of an ultrasound is to look for gallstones, which cause pain in the upper abdominal area. Hancock had pain in the lower right quadrant which is not consistent with gallstones. *Id.* at 3.

On April 28, 2020, Dr. York ordered several blood tests which were normal except for the tTG/DGP screen for celiac disease. Dr. Choi noted that the screening test has a 9% false positive rate and that the standard of care required either confirmatory blood testing with a test of higher

4

specificity or a gastrointestinal endoscopy with duodenal biopsies to confirm or reject the diagnosis of celiac disease.  Plaintiff was transferred to a different facility in August 2020, and was no longer under the care of the medical staff at USP Lee.  In June 2021, Plaintiff received an Endomysial Ig A antibody blood test, with higher specificity, which was negative.  On February 16, 2022, an upper gastrointestinal endoscopy with duodenal biopsies was negative for celiac disease.  Dr. Choi notes that the delay from April to August 2020 without any testing for celiac disease while Hancock remained at USP Lee did not cause any harm because he did not in fact have celiac disease.  *Id.* at 3–4.

Regarding Hancock's complaint that he has a gluten sensitivity, Dr. Choi explained that there is no diagnostic test for gluten sensitivity.  Further, he gave the opinion that Hancock's symptoms are more consistent with irritable bowel syndrome, not gluten sensitivity.  Hancock told the nurse at an outside gastroenterology appointment on August 31, 2021, that his constipation and abdominal pain become worse when he eats wheat and that the pain is relieved by having a bowel movement.  Those symptoms are consistent with irritable bowel syndrome.  Gluten sensitivity typically produces diarrhea, not constipation.  Finally, Dr. Choi noted that a randomized controlled study of patients with self-reported gluten sensitivity found that fructans, rather than gluten, caused their symptoms, making it unlikely that sensitivity to gluten in wheat was the cause of Hancock's ongoing problems with pain and constipation.  *Id.* at 4.

**B. Failing to Refer Hancock to a GI Specialist**

Dr. Choi stated that the standard of care did not require referring Hancock to a gastroenterologist, because the symptoms of constipation and abdominal pain were chronic, not emergent, and the x-rays, stool test for occult blood, and other stool and blood tests were

5

consistent with chronic constipation rather than a more serious condition requiring a gastroenterologist. *Id.* at 4.

### C. Refusing to Prescribe Stronger Pain Medication

Dr. Choi gave the opinion that the standard of care did not require prescribing Hancock prescription strength pain medication. In fact, such medication would have been contraindicated for Hancock, because prescription pain medication makes constipation worse. *Id.*

### D. Failing to Notify Hancock of Lab Results and Pursue Follow-Up Testing

Dr. Choi stated that the standard of care requires prompt notification to the patient of abnormal lab results. However, even if Hancock did not receive a notification promptly of the abnormal tTG/DGP screening test which is an indicator of possible celiac disease, any delay informing him of the test results and the delay in referring him for follow-up testing did not cause him harm, because the follow up testing did not show that he had celiac disease. *Id.* at 5.

### E. Failing to Provide Hancock with Seizure Medication When He Started Having Seizures Again.

Dr. Guha is board certified in Neurology, Clinical Neurophysiology, and Epilepsy. He reviewed Hancock's medical records and concluded that he suffers from a generalized epilepsy syndrome, most likely Juvenile Myoclonic Epilepsy (JME). Dr. Guha based this opinion on the age of onset (age 12), EEG features, and the types of seizures Hancock has had, myoclonic and generalized tonic-clonic. Most patients with JME do not continue having seizures if they take their medication as directed. Typical triggers for seizures include stress, sleep deprivation, and physical exertion. Guha Aff't at 3, ECF No. 46-7.

On intake at USP Lee on April 24, 2018, Hancock indicated that he had his last seizure one to three months earlier. On April 27, 2018, Hancock told Nurse Nancy Smith that he had been on Depakote for his seizures, but that he had been changed to Keppra, which made him

6

sick, and he didn't want to take it anymore. Hancock received a prescription for Depakote and signed the consent form. On May 16, 2018, when seen in follow-up, Hancock had stopped taking the Depakote because it made him itch. At Hancock's request, he was taken off Depakote and again prescribed Keppra. On July 30, 2018, he refused the bloodwork to monitor the levels of Keppra in his system. Dr. Guha gives the opinion that monitoring blood levels is essential to management of epilepsy because blood work can reveal life-threatening adverse reactions to medication before they are symptomatic, such as hepatitis or thrombocytopenia. Such monitoring can also indicate whether dosing changes might be needed or if the patient is compliant with taking the medication as prescribed. *Id.* at 4–5.

On August 9, 2018, Hancock refused to take his medication. Nurse Smith met with him on September 19, 2018, to discuss his refusal to take the epilepsy medication and his refusal to undergo the normal monitoring bloodwork. Hancock denied any seizure activity and said he did not want to start back on Keppra. After a telehealth meeting with a facility doctor in the chronic care clinic on February 28, 2019, Hancock was discharged from chronic care for his epilepsy because he had not been taking medication and had not had any problem. *Id.* at 5.

On June 17, 2019, Hancock told Nurse Smith that he was experiencing jerks (typical of myoclonic seizures); Hancock thought his epilepsy was getting worse and wanted to go back on his medicine. Plans were made to have an EEG before starting him back on the medicine. He admitted that he had stopped taking his medication the previous year, saying he did not like taking medication long-term. Hancock saw Nurse Smith in follow up on July 29, 2019, and admitted that he had stopped taking his seizure medication because he had been "getting high," and thought it would be dangerous. He then said, "I haven't had any drugs for months." *Id.*

Hancock later reported that he had convulsions on November 20, 2019, after a hard workout. He again told Nurse Smith that he wanted to go back on Keppra right away. She ordered the EEG, which was necessary before restarting the medication, and told Hancock to notify staff immediately if he felt like he was having a seizure. The EEG was conducted on December 13, 2019. Dr. Nelson interpreted the EEG scan, noting "diffuse spike and wave activity," consistent with a generalized seizure disorder. Nurse Smith received the results on January 6, 2020, and wrote a new prescription for Keppra and follow-up lab work. To ensure compliance with the medication, she placed it on the pill line, for a nurse to distribute the medication and assure Hancock took it as prescribed. At a follow-up visit with Dr. Dankwa on January 14, 2020, Hancock told the doctor that he thought sleep deprivation led to his prior seizure and that he was now seizure free. On February 18, 2020, his blood level of Keppra was 14.2 mcg/mL. On June 11, 2020, it was even lower, at 12.3 mcg/mL. Nurse Practitioner Bray met with Hancock on August 11, 2020, to discuss the lower than desired blood levels and suggested increasing his dose. Hancock did not want to increase the dose because the current dose was working, and he had no side effects. On August 28, 2020, however, Hancock told Dr. Sterett that his seizures were still occurring "a couple times a month" and that he was feeling more nervous and irritable. The seizures and mood symptoms were attributed to his epilepsy getting worse, and his Keppra dose was increased. *Id.* at 5–6.

Dr. Guha noted that Hancock's compliance with his epilepsy medication had been inconsistent not only at USP Lee, but at times before he arrived at USP Lee and after he was transferred to other facilities, based upon the medical records reviewed. *Id.* at 4, 7. Based on his history of non-compliance and being off the medication for more than a year, Dr. Guha gave the opinion that waiting for an EEG before restarting medication was an appropriate clinical

8

judgment and within the standard of care. Seizure medications can have adverse reactions, including increased myoclonic jerking. If a patient starts on the wrong dose, convulsions could result. As soon as Hancock had the EEG which was abnormal and Nurse Smith received the results, the medication was restarted. Any increased seizure activity and delay in medication was the direct result of Hancock's refusal to take medication as prescribed and his refusal to cooperate with required lab work to monitor his blood levels. Dr. Guha also noted that Hancock had been repeatedly advised of the risks of stopping his medication, including increased seizures and convulsions, and Hancock had signed off on those warnings.

Hancock has offered no evidence, expert or otherwise, to contradict the opinions of Dr. Choi and Dr. Guha. Accordingly, there is no disputed material factual issue. Based on the available evidence, Hancock cannot meet the burden of proving that medical staff breached the standard of care and that such breach caused any of the pain and suffering he complains of.

### III. Conclusion

For the reasons stated, the defendant's Motion for Summary Judgment (ECF No. 45) will be granted. An appropriate order will be entered this date.

Enter:  March 22, 2025

/s/ Robert S. Ballou

Robert S. Ballou
United States District Judge

9